UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| JUAN McGEE (#866583), | ) | |
|---|---|---|
| Plaintiff, | ) | |
| | ) | No. 06 C 3538 |
| v. | ) | |
| | ) | Judge James B. Zagel |
| THOMAS MONAHAN, et al., | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Juan McGee is a civil detainee in the custody of the Illinois Department of Human Services. At the time he initiated this action, Plaintiff was facing commitment under the Illinois Sexually Violent Persons Commitment Act, 725 ILCS § 7/1, *et seq.*; the record does not reflect his current status. Plaintiff has brought this *pro se* civil rights action pursuant to 42 U.S.C. § 1983 concerning alleged mistreatment and inhumane conditions of confinement at the Joliet Treatment and Detention Facility. This matter is before the Court for consideration of certain Defendants' motions to dismiss the complaint for failure to state a claim. For the reasons stated in this order, the motions are granted only in part.

## I. STANDARD OF REVIEW ON A MOTION TO DISMISS

It is well established that *pro se* complaints are to be liberally construed. *Haines v. Kerner*, 404 U.S. 519, 520 (1972); *see also McCormick v. City of Chicago*, 230 F.3d 319, 325 (7th Cir. 2000). They can be dismissed for failure to state a claim only if it appears "beyond doubt that Plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Haines*, 404 U.S. at 521; *Zimmerman v. Tribble*, 226 F.3d 568, 571 (7th Cir. 2000). Fact pleading is not necessary to state a claim for relief. *Thompson v. Washington*, 362 F.3d 969, 970-71 (7th Cir. 2004). Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," in order to " 'give the defendant fair notice of what the . . . claim is and

the grounds upon which it rests.' " *Bell Atlantic Corp. v. Twombly,* 550 U.S. ----, 127 S.Ct. 1955, 1964 (2007) (quoting *Conley v. Gibson,* 355 U.S. 41, 47, (1957)). To satisfy the notice pleading requirements of Fed. R. Civ. P. 8(a)(2), Plaintiff need only state his legal claim and provide "some indication . . . of time and place." *Thompson*, 362 F.3d at 971. While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. *Bell Atlantic Corp.*, 127 S.Ct. at 1964 -65 (citations omitted).

In addition, when considering whether to dismiss a complaint for failure to state a claim upon which relief can be granted, the Court takes the allegations in the complaint as true, viewing all facts–as well as any inferences reasonably drawn therefrom–in the light most favorable to Plaintiff. *Marshall-Mosby v. Corporate Receivables, Inc.*, 205 F.3d 323, 326 (7th Cir. 2000); *Bell Atlantic Corp.,* 127 S.Ct. at 1955 (citing *Swierkiewicz v. Sorema N.A*., 534 U.S. 506, 508, n. 1, (2002). Dismissal should be denied whenever it appears that a basis for federal jurisdiction in fact exists or may exist and can be stated by Plaintiff. *Norfleet v. Vale*, No. 05 C 0926, 2005 WL 3299375, at *1 (N.D. Ill. Dec. 5, 2005) (Zagel, J.). A well-pleaded complaint may proceed even if it appears "that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Bell Atlantic Corp.*, 127 S.Ct. at 1965. The purpose of a motion to dismiss is to test the sufficiency of the complaint, not to decide the merits. *Weiler v. Household Finance Corp.*, 101 F.3d 519, 524 n. 1 (7th Cir. 1996) (citations omitted).

## II. FACTS

Plaintiff sues seven employees and contractors of the Illinois Department of Human Services [hereinafter, "DHS"]. Defendants include: (1) Joliet TDF Director Thomas Monahan; (2) Hospital Administrator Carol Vance; (3) resident physician Jovita Anyanwu; (4) nurse Alice Coleman; (5) Addus Health Care, Incorporated; (6) Aramark Correctional Services; and (7) Liberty Healthcare

Corporation. Monahan, Aramark, and Liberty Healthcare have moved to dismiss the complaint for failure to state a claim.

Plaintiff alleges the following basic facts, which must be accepted as true for purposes of Defendants' motions:

On October 21, 2005, the date of Plaintiff's mandatory release from prison, he was taken to the Joliet Treatment and Detention Facility [hereinafter, "TDF"] rather than being released outright. Plaintiff was informed that he was being detained as a "sexually violent person" pursuant to 725 ILCS § 207/1. Under that statute, a sexually violent person is someone who has been convicted of a sexually violent offense (or has been found not guilty of a sexually violent offense by reason of insanity) and "who is dangerous because he or she suffers from a mental disorder that makes it substantially probable that the person will engage in acts of sexual violence." 725 ILCS § 207/5(f). Plaintiff was held at the Joliet Treatment and Detention Facility [hereinafter, "TDF"] from October 21, 2005, until the summer of 2006, when he was transferred along with all other detainees to the new facility in Rushville, Illinois.

Count I.

The Illinois Department of Corrections ordered Plaintiff's detainment at the TDF without ever examining him or finding probable cause to detain him.

The Joliet TDF is a former prison facility. Plaintiff was first placed in a newly constructed building; his cell was furnished with a steel bunk, steel writing table with attached stool, two steel shelves, a toilet, and a sink. Plaintiff was advised, however, that his placement was temporary and that he would be moved to the original, decrepit prison building if he refused to a sign a consent-to-treatment form.

Because Plaintiff refused to sign the treatment form, he was moved to the older building on the grounds. His cell had only a steel bunk bed, toilet, and sink, with no other amenities. The older building was infested by cockroaches. The cell's windows were poorly insulated and inadequately

3

heated. The water that ran from the sink was foul-smelling and discolored. Paint peeled from the walls and ceiling, and the facility was overcrowded.

Liberty Healthcare placed detainees in the older prison unit Liberty to punish them and to coerce them to accept treatment. To that end, new arrivals at the TDF who refused to sign consent-to-treatment forms, in addition to being housed in the more Spartan quarters, could not receive calls from family and friends; could not attend reward picnics; and could not receive food in the mail at Christmas. Plaintiff was thus faced with a dilemma: either endure poor living conditions, or admit a problem and get treatment–with the concession used as a ground for civil commitment.

Detainees were punished without due process. Punishment sometimes included the denial of exercise for up to ninety days.

Count II.

The provision of medical care violated detainees' right to constitutionally adequate medical treatment. Detainees requiring injections were not allowed to see syringes unsealed from their packages in order to ensure that syringes were not being re-used. A diabetic, Plaintiff required daily insulin injections.

Furthermore, the health care staff dispensed medication with their bare hands rather than wearing sanitary gloves. Plaintiff believes that the medical staff "re-dispensed" unused and dropped pills. On November 14, 2005, Plaintiff contracted a severe stomach ailment from an infection purportedly caused by the sloppy medical practices.

When Plaintiff questioned what he perceived to be unconstitutional medical practices, he was punished with false disciplinary reports. While in segregation, Plaintiff was denied personal effects, such as an electric razor. Another detainee who assisted Plaintiff with his lawsuits was also disciplined.

Count III.

Aramark Correctional Services, which contracted to provide the institution with food for the detainees, often delivered stale bread and cookies and spoiled food. Breakfasts consisted mostly of

white bread, stale cereal, and under-boiled eggs that smelled bad. Inmates were given meals only twice a day.

**III. ANALYSIS**

**A. Count I**

    **1. Pretrial Confinement**

Plaintiff is mistaken that the Illinois Department of Corrections ordered his detention at the Joliet TDF. It is up to the Attorney General or the State's Attorney of the county in which a prisoner was convicted of a sexually violent offense whether to file a petition for civil commitment. *See* 725 ILCS § 207/15(1) and (2). The IDOC's only responsibility was to inform the State's Attorney of Plaintiff's anticipated release date. 725 ILCS § 207/9. Presumably, there was a probable cause hearing for detention in accordance with 725 ILCS § 207/30. Plaintiff cannot sue Defendants regarding the fact of his pretrial confinement.

    **2. Prison-Like Environment**

Plaintiff maintains that the Joliet TDF was operated like a prison. The Constitution required Defendants to house Plaintiff under "humane conditions" and to provide him with "adequate food, clothing, shelter, and medical care." *Sain v. Budz*, No. 05 C 6394, 2006 WL 539351, *2 (N.D. Mar. 3, 2006) (Conlon, J.), *citing Farmer v. Brennan*, 511 U.S. 825, 832 (1994). Like a pretrial detainee, a sexually violent person may not be subjected to conditions that amount to "punishment" without due process. *See, e.g., Jones v. Blanas*, 393 F.3d 918, 932 (9th Cir. 2004). "Persons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." *Youngberg v. Romeo*, 457 U.S. 307, 321-22 (1982). "[D]ue process requires that the conditions and duration of confinement . . . bear some reasonable relation to the purpose for which persons are committed." *Seling v. Young*, 531 U.S. 250, 265 (2001); *West v. Schwebke*, 333 F.3d 745, 748 (7th Cir. 2003).

Detainees may nevertheless be subjected to conditions that advance goals such as preventing escape and assuring the safety of others, even though they may not technically be "punished." *Allison v. Snyder*, 332 F.3d 1076, 1079 (7th Cir. 2003), *citing Allen v. Illinois*, 478 U.S. at 373-74 (1986).

> Does placement in a prison, subject to the institution's usual rules of conduct, signify punishment? The answer, given by *Bell v. Wolfish*, 441 U.S. 520 (1979), is no. *Wolfish* held that pretrial detainees, who like civil committees may be held for security reasons but not punished, may be assigned to prisons and covered by the usual institutional rules, which are designed to assure safety and security.

*Allison*, 332 F.3d at 1079.

Furthermore, in *Hargett v. Adams*, No. 02 C 1456, 2005 WL 399300 (N.D. Ill. Jan. 14, 2005), a sweeping class action lawsuit brought by the American Civil Liberties Union relating to the treatment of sexually violent committees, Judge Leinenweber of this court found that although the "prison-like" environment of the Joliet TDF was not conducive to a "positive therapeutic milieu," the setting did not significantly impede the delivery of effective treatment. 2005 WL 399300 at *2. The fact that Joliet TDF was operated much like a prison did not, in and of itself, violate Plaintiff's constitutional rights.

**3. Denial of Privileges for Refusing to Sign a Request for Treatment**

Plaintiff claims that he was denied certain privileges and amenities because he refused to sign a form agreeing to participate in the sex offender treatment program; those inmates who agreed to therapy received preferential treatment. Defendants' motion to dismiss this claim is likewise granted.

In *Hargett v. Adams*, *supra*, 2005 WL 399300, Judge Leinenweber found in favor of the treatment program on identical claims. Following a trial, Judge Leinenweber concluded that it was proper to base the receipt of privileges on "participation in treatment" and good behavior. Judge Leinenweber ruled:

> The use of a variety of statuses within the TDF that correspond with privileges, including room location, increased freedom of movement, and access to certain commissary items, is not atypical of institutional and quasi-correctional settings. There are rational security concerns underlying the decision to have all patients initially begin at a lower end of the privilege continuum: in many instances, the staff

do not initially know the potential risks of a new patient. In addition, making privileges contingent on good behavior and participation in treatment, creates positive contingencies and reinforcements for productive therapeutic behavior.

*Hargett*, 2005 WL 399300 at *8.

Pursuant to *Hargett*, Judges Lefkow and Filip of this district have recently dismissed detainees' claims that they were subject to "retaliation" in the form of greatly reduced amenities for refusing to sign a consent-to-treatment form: "[B]ecause Plaintiff has not signed up for the treatment program, he is not entitled to the same privileges, including better housing, as those residents who have agreed to treatment. Because this issue has already been addressed and decided in *Hargett*, Plaintiff's claim . . . is dismissed." *See Williams v. Monahan*, No. 06 C 2447 (N.D. Ill.), Minute Order of June 30, 2006, at p. 2 (Lefkow, J.); *see also Lieberman v. Budz*, No. 03 C 2009, 2007 WL 1810493, at *10 (N.D. Ill. Jun. 19, 2007) (Filip, J.).

In short, because Plaintiff refused to sign up for the treatment program, he was not entitled to the same privileges and amenities as those detainees who agreed to undergo treatment. This Court agrees with the rulings made by Judges Leinenweber and Lefkow and adopts their shared conclusion that the preferential treatment of those who agree to treatment does not violate the Equal Protection Clause.

**4. Inhumane Conditions of Confinement**

Even though Plaintiff has no cause of action regarding either the "prison-like" manner in which TDF operated or the inferior treatment he received as a detainee who refused to treatment, he describes conditions that could arguably have violated his constitutional rights. As noted in preceding paragraphs, the Constitution required that Plaintiff be housed under "humane conditions" and that the State provide him with "adequate food, clothing, shelter, and medical care." *Sain v. Budz*, *supra*,

2006 WL 539351, at *2. According to Plaintiff, his housing unit was roach-infested, inadequately heated during the winter months, overcrowded, and the drinking water was contaminated. These allegations are sufficient to state a cause of action under 42 U.S.C. § 1983. *See e.g.*, *Antonelli v. Sheahan*, 81 F.3d 1422, 1431 (7th Cir. 1996) (allegations of low temperatures and pest infestation were actionable under the Civil Rights Act); *Dixon v. Godinez*, 1154 F.3d 640, 646 (7th Cir. 1997) (common problems may rise to the level of a constitutional violation if they exist for a prolonged period); *Wellman v. Faulkner*, 715 F.2d 269, 274-75 (7th Cir. 1983) (overcrowding may rise to constitutional concern where the situation engenders undue violence, sanitary and maintenance problems, and psychological suffering). Of course, in order to survive a summary judgment motion, Plaintiff will have to provide proof of his claims. But at this stage of the proceedings, Plaintiff has articulated colorable claims.

**5. Disciplinary Proceedings**

Plaintiff speaks generally of the denial of due process in connection with disciplinary proceedings. This is not a class action and Plaintiff has no standing to sue on behalf of other inmates. A non-lawyer cannot prosecute a suit on behalf of another. *See, e.g., Navin v. Park Ridge Sch. Dist. 64*, 270 F3d 1147, 1149 (7th Cir. 2001). However, if Plaintiff himself was punished without due process, then he may be entitled to relief under 42 U.S.C. § 1983.

Determining what process is due a person detained as a sexually violent person has evolved over the last several years. In *Thielman v. Leean*, 282 F.3d 478 (7th Cir. 2002), the Seventh Circuit Court of Appeals applied the seminal case of *Sandin v. Connor*, 515 U.S. 472 (1995), to civilly detained individuals. In *Sandin*, the Supreme Court held that state-created liberty interests are "generally limited to freedom from restraint which, while not exceeding the sentence in such an

8

unexpected manner as to give rise to protection by the Due Process Clause of its own force, nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." 515 U.S. at 484.

Although *Sandin* involved prison discipline, the Seventh Circuit applied the same reasoning to the civil detainee setting. In *Thielman*, a Wisconsin detainee committed under that state's sexually violent persons statute challenged the use of restraints during transport from the detention facility to an outside medical hospital or clinic. *Thielman* upheld the use of restraints, noting,

> Someone is involuntarily committed, generally speaking, because his mental illness makes him a safety risk to himself or others. Accordingly, his commitment entails some sort of restraint, and that restraint is often significant. The *Sandin* rule simply gives state officials some discretion in determining how much restraint is necessary in a given situation. . . .

*Thielman*, 282 F.3d at 483 n. 1. Moreover, the Seventh Circuit has held that civil detainees, just like prisoners, are subject to security measures typically used at correctional facilities. *See Allison v. Snyder*, 332 F.3d 1076, 1079 (7th 2003) ("If pretrial detainees may be subjected to the ordinary conditions of confinement, as *Wolfish* holds, then so may persons detained before trial as sexually dangerous persons.").

The Seventh Circuit Court of Appeals explicitly addressed discipline and related behavioral restrictions as to the State of Wisconsin's Sexually Violent Persons Commitment Program in *West v. Schwebke*, 333 F.3d 745, 748 (7th Cir. 2003), and held:

> To the extent that plaintiffs are uncontrollably violent, and thus pose a danger to others, Wisconsin is entitled to hold them in segregation for that reason alone; preserving the safety of the staff and other detainees takes precedence over medical goals. So we said in *Thielman v. Leean*, 282 F.3d 478 (7th Cir. 2002). . . . Just as a pretrial detainee may be put in isolation–indeed, may be **punished** for violating institutional rules, provided that the jailers furnish notice and an opportunity for a hearing, see *Higgs v. Carver*, 286 F.3d 437 (7th Cir. 2002)–so a civil detainee may be

9

isolated to protect other detainees from aggression. Institutions may employ both incapacitation and deterrence to reduce violence within their walls. . . . (emphasis in original).

Illinois' SVP regulations themselves do not create any additional rights. To the contrary, the Illinois Administrative Code, *see* 59 Ill. Admin. Code 299.620 *et seq.*, gives the staff considerable discretion with regard to institutional disturbances, safety and security measures, and room confinement. The rules also provide for differing management levels, from "secure management" status to "high privilege" status. *See* Section 299.600. The withdrawal of positive incentives is intended to discourage misbehavior and encourage appropriate activities. *Id.*

Nevertheless, despite the availability of disciplinary sanctions, as well as the wide latitude afforded the TDF staff in their management of the detainees in their care, the Court cannot adopt Defendants' implicit contention that they must be granted *carte blanche* to discipline civil detainees. Even in upholding disciplinary measures in the SVP setting, the Court of Appeals in *West v. Schwebke*, 333 F.3d at 748, took care to note that detainees must receive notice and an opportunity to be heard.

In short, while officials had the authority to punish Plaintiff for misconduct, he was constitutionally entitled to procedural due process in connection with the disciplinary hearings. The Court interprets the *Thielman* holding as applying *Sandin* to general security measures as well as broadly comparing the status of sexually violent persons to individuals held as prisoners. Surely those cases did not intend to wholly insulate civil detainees from the protection of the federal courts. Civil detainees are entitled to at least the same basic procedural safeguards accorded to pretrial detainees and convicts. The Court entirely adopts Judge Kocoras' well-reasoned opinion in *Ehrlich*

*v. Mantzke*, No. 01 C 7449, 2002 WL 265177 (N.D. Ill. Feb. 25, 2002) as it relates to due process protections required in disciplinary proceedings against civil detainees.

Under *Ehrlich*, sexually violent persons facing discipline are entitled to the following basic safeguards in order to satisfy the Due Process Clause:

> (1) advance written of the charges against the inmate at least twenty-four hours before the hearing; (2) the opportunity to call witnesses and present documentary evidence, when consistent with institutional safety and correctional goals; (3) a written statement by the factfinder of the evidence relied on and the reasons for the disciplinary action; and (4) a decision supported by "some evidence" in the record.

*Ehrlich*, 2002 WL 265177 at *4, *citing Superintendent, Massachusetts Correctional Inst. v. Hill*, 472 U.S. 445, 454 (1985) and *Wolff v. McDonnell*, 418 U.S. 539, 56-67 (1974). In light of the above legal framework, the Court is unwilling to dismiss Plaintiff's disciplinary claims on the basis of the undeveloped record.

### 6. Suspension of Exercise Privileges

Plaintiff may also be entitled to relief if he personally was denied the opportunity to exercise for protracted periods. Again, in his complaint Plaintiff speaks generally of detainees being punished with the denial of exercise for up to ninety days, without indicating that he himself ever went without exercise. Furthermore, it should be emphasized, "Unless extreme and prolonged, lack of exercise is not equivalent to a medically threatening situation." *Harris v. Fleming*, 839 F.2d 1232, 1236 (7th Cir. 1988) (confinement in segregation unit for four weeks). There is a significant difference between a lack of outdoor recreation and an inability to exercise. An inmate confined to the segregation unit retains the ability to improvise an exercise regimen in his cell or unit. Plaintiff will be given the chance to pursue a denial-of-exercise claim.

**B. Count II**

    **1. Medical Care**

Plaintiff has articulated a colorable–if doubtful–claim regarding the quality of medical care. Prison officials may not act with deliberate indifference to an inmate's serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 105 (1976). Detainees awaiting trial are similarly afforded *Estelle*-like protection against medical mistreatment under the Due Process Clause. *Holmes v. Sheahan*, 930 F.2d 1196, 1199 (7th Cir. 1991). "To cast this notion in the language of tort, the [State or] County has an affirmative duty to provide persons in its custody with a medical care system that meets minimal standards of adequacy." *Holmes*, 930 F.2d at 1199 (citations omitted). The subjective element of deliberate indifference encompasses conduct such as the refusal to treat a prisoner's chronic pain, *Jones v. Simek*, 193 F.3d 485, 490 (7th Cir. 1999), the refusal to provide pain medication prescribed by doctor, *Ralston v. McGovern*, 167 F.3d 1160, 1162 (7th Cir. 1999), or erroneous treatment based on a substantial departure from accepted medical judgment, practice, or standards. *Sherrod*, 223 F.3d at 611; *Vance v. Peters*, 97 F.3d 987, 992 (7th Cir. 1996).

The Court does not read the complaint to allege deliberate indifference to a stomach ailment; rather, Plaintiff maintains that he became sick to his stomach on account of sloppy medical practices. Although it seems unlikely that health care personnel were re-using syringes or that handling medication without gloves made Plaintiff ill, the Court will accept Plaintiff's account as true at this stage of the proceedings. The fact that a prisoner received **some** medical treatment does not necessarily defeat his claim; deliberate indifference to a serious medical need can be manifested by "blatantly inappropriate" treatment, *Greeno v. Daley*, 414 F.3d 645, 654 (7th Cir. 2005) (emphasis in original), as well as by "woefully inadequate action." *Reed v. McBride*, 178 F.3d 849, 854 (7th Cir.

12

1999). Plaintiff may further develop his claim that the medical care system at the TDF was so deficient as to violate his constitutional rights.

Again, in order to defeat a motion for summary judgment, Plaintiff will have to substantiate his claims, proving by a preponderance of the evidence that he was harmed by shoddy medical practices. Nevertheless, it is not the case that Plaintiff could prove "no set of facts" entitling him to relief. *Haines v. Kerner*, 404 U.S. 519, 521 (1972), *reh'g denied*, 405 U.S. 948 (1972). The Court cannot, on the basis of the undeveloped record, conclude that Plaintiff received adequate medical care while housed at the Joliet Treatment and Detention Facility.

**2. Retaliation**

Plaintiff alleges that when he questioned what he perceived to be unconstitutional medical practices, he was punished with false disciplinary reports. It is well established that prison officials violate the Constitution when they retaliate against a prisoner for filing grievances or initiating lawsuits. *Bounds v. Smith*, 430 U.S. 817, 821 (1977); *Walker v. Thompson*, 288 F.3d 1005, 1009 (7th Cir. 2002). Plaintiff may pursue his retaliation claim.

**3. Conditions in Segregation**

As discussed in preceding paragraphs, Plaintiff's placement in a less desirable housing unit for violation of facility rules would not violate his constitutional rights. It is not unreasonable to treat detainees who follow rules differently than those who do not. Furthermore, although Plaintiff asserts that "a black man needs his electric razor," the Court finds that the temporary denial of such personal effects did not rise to the level of a constitutional violation. Plaintiff has failed to state a cognizable cause of action with regard to the conditions in segregation (except insofar as he may have been denied the opportunity to exercise, as discussed *supra*).

## C. Count III. Food

Plaintiff has stated a viable claim against Aramark regarding the food at the Joliet TDF. Defendants are correct that some of Plaintiff's quibbles do not implicate the Constitution: to the extent that Plaintiff complains the food was stale, cold, or generally inferior to prison food, those matters are not actionable under 42 U.S.C. § 1983. However, being served **spoiled** food may rise to the level of a constitutional violation, as would being served an insufficient amount of food or a non-balanced diet that consisted mostly of starchy carbohydrates.

There is no question that inmates have a constitutional right to an adequate diet. *See, e.g., Antonelli v. Sheahan*, 81 F.3d 1422, 1432 (7th Cir. 1996). "The state must provide an inmate with a 'healthy, habitable environment.' This includes providing nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it." *French v. Owens*, 777 F.2d 1250, 1255 (7th Cir. 1985) (citations omitted). Contrary to Aramark's assertion in its brief, the complaint does suggest that the food served at the Joliet TDF was non-nutritious, both because it was sometimes rancid and because detainees received only two meals a day. In order to survive a motion for summary judgment, Plaintiff will have to prove his claims, of course. But his allegations are sufficient to withstand a motion to dismiss.

## D. Personal Involvement

Defendants contend that Plaintiff has failed to state a cause of action against upper level officials and corporate entities. It is true that liability under 42 U.S.C. § 1983 requires a defendant's direct, personal involvement. *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995). Section 1983 creates a cause of action based on personal liability and predicated upon fault; thus, "to be liable

under § 1983, an individual defendant must have caused or participated in a constitutional deprivation." *Pepper v. Village of Oak Park*, 430 F.3d 809, 810 (7th Cir. 2005) (citations omitted). The doctrine of *respondeat superior* (blanket supervisory liability) does not apply to actions filed under 42 U.S.C. § 1983. *See Sanville v. McCaughtry,* 266 F.3d 724, 740 (7th Cir. 2001). To be held liable under 42 U.S.C. § 1983, supervisors "must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see. They must in other words act either knowingly or with deliberate, reckless indifference." *Id.*

Nevertheless, *Antonelli v. Sheahan*, 81 F.3d 1422 (7th Cir. 1996), teaches that dismissal of a *pro se* complaint on grounds of lack of active personal involvement is inappropriate where the official's position justifies an inference that the official had some direct involvement in the alleged violation. *Antonelli* concerned broad claims of unconstitutional conditions of confinement. In that case, the Court of Appeals found that an inference of involvement was justified to sustain claims asserted against certain senior officials, such as the county sheriff or the prison warden, where the claims alleged "potentially systemic," rather than "clearly localized," constitutional violations. *Id.* at 1428-29. In the case at bar, Plaintiff's claims clearly focus on non-localized, systemic violations--he takes issue with numerous aspects of the conditions of his confinement. Furthermore, Plaintiff contests express policies of Liberty Healthcare. *Compare Jackson v. Ill. Medi-Car, Inc.*, 300 F.3d 760, 766 (7th Cir. 2002). The complaint sets forth arguable claims against supervisory officials and entities.

### E. Mootness of Claims for Injunctive Relief

It would seem that some or all of Plaintiff's claims for injunctive relief may have been mooted by his transfer to the new facility in Rushville. Certainly, he is no longer subject to the conditions

of confinement presented in the old wing at the Joliet Treatment and Detention Facility. If a prisoner is transferred to another prison, his request for injunctive relief against officials of the first prison is moot unless he can demonstrate that he is likely to return to that prison. *Higgason v. Farley*, 83 F.3d 807, 811 (7th Cir. 1996). However, Plaintiff's claims concerning alleged mistreatment by DHS and Liberty officials may be ongoing. Therefore, the Court will not at this time address the issue of mootness.

## CONCLUSION

In view of the foregoing, Defendants' respective motions to dismiss are granted in part and denied in part.

IT IS THEREFORE ORDERED that Defendants' motions to dismiss the complaint for failure to state a claim [document numbers 25, 41, and 65] are granted pursuant to Fed. R. Civ. P. 12(b)(6) only to the extent that Plaintiff: (1) challenges the fact of his pretrial confinement; (2) claims that the Joliet TDF was operated like a prison; and (3) contends that detainees who consented to treatment and those who obeyed institutional rules received preferential treatment. Plaintiff may proceed on all remaining claims, as outlined in the body of this order.

IT IS FURTHER ORDERED that Plaintiff's motions to deny Defendants' motions to dismiss [document nos. 34 and 45] are granted in part and denied in part for the same reasons.

IT IS FURTHER ORDERED that Defendants Thomas Monahan, Liberty Healthcare Corporation, and Aramark Correctional Services answer or otherwise plead within twenty-one days of the date of this order.

IT IS FURTHER ORDERED that Plaintiff's motion to deny Defendants' motion to reassign [#74] is denied as moot, as no such motion is on file.

IT IS FURTHER ORDERED that the remaining defendants' motion for leave to file their motion for summary judgment within 28 days of the date of this order [#71] is granted.

ENTER: September 14, 2007

_____
**James B. Zagel**
**United States District Judge**