# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

JUAN McGEE (#866583),        )
                                   )
              Plaintiff,   )
                                   )   **No. 06 C 3538**
        v.                  )
                                   )   **Judge James B. Zagel**
                                 )
THOMAS MONAHAN, et al.,     )
                                 )
            Defendants.  )

## MEMORANDUM OPINION AND ORDER

The plaintiff, a civil detainee in the custody of the Illinois Department of Human Services, has brought this *pro se* civil rights action pursuant to 42 U.S.C. § 1983. The plaintiff challenges the conditions of his confinement at the Joliet Treatment and Detention Facility, where he was held prior to being transferred to the new installation in Rushville, Illinois. By Memorandum Opinion and Order of September 14, 2007, the court dismissed certain claims pursuant to Fed. R. Civ. P. 12(b)(6). This matter is before the court for ruling on the various defendants' motions for summary judgment as to the plaintiff's remaining claims. For the reasons stated in this order, the motions are granted.

## I. STANDARD OF REVIEW ON A MOTION FOR SUMMARY JUDGMENT

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Vision Church v. Village of Long Grove*, 468 F.3d 975, 988 (7th Cir. 2006). In determining whether factual issues exist, the court must view all the evidence and draw all reasonable inferences in the light most favorable to the non-moving party. *Walker v. Northeast Regional Commuter Railroad Corp.*, 225 F.3d 895, 897 (7th Cir. 2000).

However, Rule 56(c) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Sarver v. Experian Information Solutions*, 390 F.3d 969, 970 (7th Cir. 2004) (citations omitted).

## II.  FACTS

The plaintiff is a pretrial detainee, in the custody of the Illinois Department of Human Services while he faces civil commitment pursuant to the Illinois Sexually Violent Persons Commitment Act, 725 ILCS § 207/1, *et seq.*  At all times relevant to this action, the plaintiff was housed at the Joliet Treatment and Detention Facility (hereinafter, "TDF").

Plaintiff sues seven employees and contractors of the Illinois Department of Human Services [hereinafter, "DHS"].  The defendants are:  (1) Joliet TDF Facility Director Thomas Monahan; (2) Hospital Administrator Carol Vance; (3) resident physician Jovita Anyanwu; (4) nurse Alice Coleman; (5) Addus Health Care, Incorporated; (6) Aramark Correctional Services; and (7) Liberty Healthcare Corporation.

Together with their summary judgment motions, the defendants served on the plaintiff the required notice under Local Rule 56.2 (N.D. Ill.), advising the plaintiff what he needed to do to contest the motions, and specifically what he needed to do to dispute the defendants' respective statements of uncontested facts.  (*See* Notice to Pro Se Litigant Opposing Motion for Summary Judgment, document nos. 87, 112, 114.)  Despite this, the plaintiff has not submitted a statement of contested facts with citations to the record; instead, he simply elaborates on or equivocates about certain facts in his opposing brief, without referencing any supporting documentation.  But unsupported statements in a brief are not evidence and cannot be given any weight. *See, e.g., Johnson v. Spiegel, Inc.*, No. 02 C 0680, 2002 WL 1880137, at *4 (N.D. Ill. Aug. 15, 2002) (Pallmeyer, J.), *citing In the Matter of Morris Paint and Varnish Co.*, 773 F.2d 130, 134 (7th Cir. 1985).

The plaintiff's failure to respond to the defendants' statements of material facts as directed warrants disregard of any contrary assertions he makes in his briefs. *See Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003):

> Local Rule 56.1's enforcement provision provides that when a responding party's statement fails to controvert the facts as set forth in the moving party's statement in the manner dictated by the rule, those facts shall be deemed admitted for purposes of the motion. . . . We have consistently held that a failure to respond by the nonmovant as mandated by the local rules results in an admission. *See, e.g., Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 689 (7th Cir. 2000). A district court is not required to "wade through improper denials and legal argument in search of a genuinely disputed fact." *Bordelon v. Chicago School Reform Bd. of Trustees*, 233 F.3d 524, 529 (7th Cir. 2000). And a mere disagreement with the movant's asserted facts is inadequate if made without reference to specific supporting material. *Edward E. Gillen Co. v. City of Lake Forest*, 3 F.3d 192, 196 (7th Cir. 1993).

The court need not "scour the record to make the case of a party who does nothing." *Greer v. McCurry*, No. 02 C 4326, 2003 WL 21826549, *6 (N.D. Ill. Aug. 5, 2003) (Zagel, J.)., *quoting Johnson v. Gudmundsson*, 35 F.3d 1104, 1116, n. 9 (7th Cir. 1994); *see also Tatalovich v. City of Superior*, 904 F.2d 1135, 1139 (7th Cir. 1989) (the court is not required to comb the record for evidence contradicting the moving party's statements in support of its motion for summary judgment). "Rule 56 demands something more than the bald assertion of the general truth of a particular matter, rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted." *McMillian v. Svetanoff*, 878 F.2d 186, 190 (7th Cir. 1989.) "Summary judgment is the 'put up or shut up' moment in a lawsuit. Once a party has made a properly-supported motion for summary judgment, the opposing party may not simply rest upon the pleadings but must instead submit evidentiary materials that set forth specific facts showing that there is a genuine issue for trial." *Harney v. Speedway SuperAmerica, LLC*, 526 F.3d 1099, 1104 (7th Cir. 2008) (citations omitted).

The following facts are therefore undisputed for purposes of the defendants' motions for summary judgment:

On October 21, 2005, the date of the plaintiff's mandatory release from prison, he was taken to the Joliet TDF rather than being released outright. (Complaint, p. 6.) The plaintiff was informed that he was being detained as a "sexually violent person" pursuant to 725 ILCS § 207/1. *Id.* Under that statute, a sexually violent person is someone who has been convicted of a sexually violent offense (or has been found not guilty of a sexually violent offense by reason of insanity) and "who is dangerous because he or she suffers from a mental disorder that makes it substantially probable that the person will engage in acts of sexual violence." 725 ILCS § 207/5(f). The plaintiff was held at the Joliet TDF from October 21, 2005, until August 19, 2006, when he was transferred along with all other detainees to the DHS's new facility in Rushville, Illinois. (Complaint, pp. 6-7; Liberty's Exhibit B, Deposition of Juan McGee, p. 6.)

The plaintiff lived in a newer housing unit for the first two months of his stay at the Joliet TDF. (Complaint, pp. 6-7; Plaintiff's Depo., p. 7.) The plaintiff understood that the new housing unit was limited to residents who participated in sex offender treatment. (*Ibid.*) The plaintiff also understood that he would have been permitted to remain in the new housing unit if he had consented to sex offender treatment. (*Ibid.*) However, because the plaintiff refused to consent to sex offender treatment, he was placed in an older building. (*Ibid.*)

Facts Relating to Liberty Healthcare Corporation

The Illinois Department of Human Services, and not Liberty Healthcare Corporation, operated the Joliet TDF. (725 ILCS 207/50; Liberty's Exhibit C, Declaration of Shan Jumper, ¶ 4. Shan Jumper, an employee of Liberty Healthcare and the TDF's Associate Clinical Director (later, Director), did not have any responsibilities with regard to the maintenance or operation of the Joliet TDF's physical plant, pest abatement, water supplies, and/or the facility's heating and cooling systems. (Jumper Affidavit, ¶¶ 6-7.)[1]

---

[1]

In his response to Liberty's motion for summary judgment, the plaintiff disputes this and many other
(continued...)

Liberty and its employees (psychologists and therapists) provide sex offender treatment to individuals who consent to receive sex offender treatment under the SVP Act. (*Id.*, ¶ 2.) In his role as Clinical Director, Jumper has and had no power to direct DHS staff how to maintain the physical plant. (*Id.*, ¶ 8.) Jumper did not and does not contract with outside vendors in connection with plant maintenance. (*Id.*, ¶¶ 9, 10.)

Jumper's common practice and custom is to refer any written resident complaints to the resident's assigned primary therapist. (*Id.*, ¶ 11.) Jumper undertook this practice as he found it was impossible for him to personally respond to or follow up with every resident complaint he received. (*Id.*)

Dr. Jumper has no independent recollection of whether the plaintiff ever wrote to him to complain about his housing conditions. (*Id.*, ¶ 20.) If the plaintiff did write to Jumper, Jumper most likely would have skimmed the letter and then forwarded it to the plaintiff's primary therapist for follow-up. (*Id.*, ¶ 22.) Jumper would have likewise forwarded a request for a face-to-face meeting to the plaintiff's primary therapist. (*Id.*)

The Joliet TDF has and had administrative grievance procedures in place. (*Id.*, ¶ 21; *see also* 59 Ill. Admin. Code § 299.820.) Grievances are initially reviewed by a grievance examiner, who investigates the grievance and makes a recommendation. (Jumper Affidavit, ¶ 21.). The TDF's facility director, and not its clinical director, generally renders the final decision. (*Id.*) Jumper has no role in the grievance process unless he is called upon to give an opinion about a particular matter. (*Id.*)

---

[1](...continued)
assertions made by Jumper. However, the plaintiff bases most of his objections solely on a professed "lack of knowledge." Because the plaintiff has come forth with no evidence to refute Jumper's representations, made under oath, the court deems them uncontested. *See also, United States v. Stevens*, 500 F.3d 625, 628-29 (7th Cir. 2007) (arguments in a brief that are unsupported by documentary evidence are not evidence).

Jumper never observed housing conditions to be less than well maintained, sanitary, and otherwise hospitable. (*Id.*, ¶ 23.) Housing units were sprayed at least twice a month by outside contractors. (*Id.*; Plaintiff's Depo., pp. 38-40.) The maintenance staff regularly made repairs in resident living quarters. (Jumper Affidavit, ¶ 23.)

The maintenance staff routinely took temperature readings for quality control purposes. (*Id.*, ¶ 23.) The maintenance staff brought large air circulation fans into the housing units during the summer months and the staff provided residents with additional blankets during the winter months. (*Id.*; Plaintiff's Depo., pp. 30-31.) Although the older housing units at the Joliet TDF did not have central air, cooler air was circulated through the day rooms by large, built-in, overhead circulation units. (Jumper Affidavit, ¶ 23.)

The plaintiff was placed on "closed management status" (which the court gathers means unit restriction) for three, 30-day periods as a result of committing three consecutive rule violations. (Plaintiff's Depo., pp. 53, 77-78.) When the plaintiff was on unit restriction, he could not leave his living unit, but he had access to the day room. (*Id.*, p. 53.)

Normally, even residents on closed management status due to rule violations were permitted outdoor exercise. (*Id.*) However, the plaintiff contends that he was not allowed to exercise outside of his room for ninety days. (*Id.*, p. 75.) The plaintiff chose not to exercise in his room because he thought the ventilation was inadequate. (*Id.*, p. 51.) The plaintiff did not suffer any physical injuries as a result of not exercising outside for ninety days. (Exhibit B to Defendant Monahan's Motion for Summary Judgment, Depo. of Juan McGee, p. 76.)

Neither Jumper nor any Liberty employee ever revoked the plaintiff's exercise privileges, and Jumper was not aware of any exercise restriction ever being imposed upon the plaintiff. (Id., ¶¶ 29, 30.) The Behavior Management Committee did not issue restrictions on resident exercise when a resident was found to have violated a facility rule or order. (*Id.*, ¶ 30.) If a resident were ever denied exercise for security reasons, that decision would have been made by the TDF's Security Director or Facility Director, DHS employees. (*Id.*)

With regard to each conduct report, the plaintiff was afforded a hearing before the Behavior Committee to give his account of what happened. (*Id.*, p. 55.) The plaintiff received a verbal warning for one rule violation (*id.*, p. 57); for a second rule violation, the Behavior Committee recommended that he join an anger management therapy group. (*Id.*, pp. 58-59.) On a third occasion, the plaintiff was restricted to his housing unit for seven days for failing to wear his yellow jumpsuit. (*Id.*, pp. 59, 62.)[2]

In the fall of 2004 (before the plaintiff arrived at the Joliet TDF), an expert hired by the American Civil Liberties Union tested the Joliet TDF for health, sanitation, pest, and temperature-related issues in connection with a class action before Judge Harry D. Leinenweber of this court. (*Id.*, ¶¶ 25-26.) Although the expert did not issue a formal report, it was Jumper's understanding that the expert found no major faults with the physical conditions at the Joliet TDF. (*Id.*). The fact that Judge Leinenweber and the ACLU expert toured the facility without Jumper learning of any serious concerns further supported Jumper's belief that housing conditions at the TDF were reasonable and adequate. (*Id.*)

The plaintiff never submitted any written complaints to Liberty Healthcare about the conditions of his confinement. (*Id.*, pp. 29-33, 78.).

Facts relating to Aramark Correctional Services

Aramark has a contract with the State of Illinois to provide food service to Illinois Department of Human Services detention facilities. (Complaint, Exhibit A.)

Within twenty-four days of his arrival at the Joliet TDF, the plaintiff suffered a severe stomach ailment. (Defendant's Depo., pp. 150-51.) The plaintiff believes his illness may have been caused by a nurse not wearing gloves when she gave him an insulin injection, by food poisoning, or

---

[2]

The court cannot find any record of a ninety-day (or three, thirty-day) unit restrictions. However, the court will assume for purposes of the defendants' motions for summary judgment that the plaintiff did go ninety days without being allowed any outdoor recreation.

by the "contaminated" water. (*Id.*, p. 179.) The plaintiff made four requests for medical attention during his confinement at the Joliet TDF. (*Id.*, p. 174.) Three of those requests (dated November 16, 18 and 20, 2005) related to the stomach ailment. (*Id.*, pp. 177-78.) [The parties have not disclosed the nature of the fourth request for medical attention.] During the ten-day period that the plaintiff suffered the stomach ailment, he threw up blood, had bad headaches, and was afflicted by diarrhea.

Every day, a resident dispensed breakfast from a plastic bag in the day room. (*Id.*, p. 180.) The food was invariably cold. (*Id.*.) Aramark employees would serve the food when the residents were on "lockdown." (*Id.*, p. 179.) The cookies, bread and cereal were often stale. (*Id.*, p. 182.) On more than occasion, the plaintiff received spoiled chicken and undercooked eggs. (*Id.*, p. 183.)

The plaintiff was once placed on lockdown for verbally complaining to an unknown Aramark employee about the food. (*Id.*, p. 181.) The plaintiff never made a written complaint about the food. (*Id.*, pp. 181-82.) Nor did the plaintiff ever file a grievance regarding the food quality. (*Id.*) The plaintiff did file a grievance dated November 3, 2005, about a missed breakfast.

The plaintiff suffers from diabetes. (*Id.*, p. 51.) The plaintiff does not believe he was served diabetic breakfasts. (*Id.*, p. 184.) However, from the point that he was transferred to the old unit at Joliet TDF until the filing of the complaint, the plaintiff suffered no illnesses other than the stomach ailment that troubled him shortly after his arrival at the facility.

Facts Relating to the "Health Care Defendants"

As discussed *supra*, the plaintiff suffered from a severe stomach ailment in November 2005. Health care providers gave the plaintiff Maalox to treat his symptoms and Tylenol 3 with codeine[3]

---

[3]

In response to the defendants' motion for summary judgment, the plaintiff now asserts that Nurse Coleman contravened the doctor's orders and gave the plaintiff regular Tylenol rather than Tylenol 3. However, the plaintiff specifically stated at his deposition that he was given Tylenol 3. A party may not create an issue of fact by contradicting previous depositions or other sworn testimony. *See, e.g., Ineichen v. Ameritech*, 410 F.3d 956, 963 (7th Cir. 2005).

to treat his pain.  (Health Care Defendants' Exhibit A, Deposition of Juan McGee, pp. 152-153.)

As also noted above, the plaintiff is diabetic.  Throughout his confinement at the Joliet TDF, the plaintiff received insulin shots twice a day for his diabetes.  (*Id.*, p. 154.)  On multiple occasions, however, the plaintiff refused his insulin shots.  (*Id.*)  The plaintiff refused the shots whenever, he says, he saw the nursing staff engage in unsanitary practices (nose-picking, bottom-scratching, failing to done gloves).  (*Id.*)  The plaintiff additionally objected to the institution's policy of dispensing room-temperature, already-filled, unsealed syringes, rather than his being permitted to witness the needles being unwrapped from their packages, and the insulin being taken from a refrigeration unit and drawn into the syringe.  (*Id.*, p. 156.)

The plaintiff also received daily medicine cups with pills for unspecified conditions.  (*Id.*)  Once, a nurse (not a defendant) dropped a pill on the floor and then picked it up and attempted to give it to the plaintiff anyway.  (*Id.*, p. 146.)  The plaintiff refused to take the pill despite the nurse's coaxing that it was "nothing but a little dirt."  (*Id.*).  There were no other instances of medication being dropped on the ground and then being given to the plaintiff.  (*Id.*, p. 146-47.)

The plaintiff has never seen a syringe used on a resident and then re-used on another resident at the Joliet TDF.  (*Id.*, p. 149.)

No doctor ever told the plaintiff that the stomach ailment might have been caused by the failure of the nursing staff to wear gloves while dispensing medication.  (*Id.*, p. 151.)

On an unspecified date, defendant Coleman issued the plaintiff a disciplinary report for allegedly engaging in "aggressive conduct."  (*Id.*, p. 166.)  Although the plaintiff denies that he acted aggressively, he concedes that he became upset with Coleman and raised his voice.  (*Id.*, pp. 166-67.)  While there is no record of the disciplinary report, (*id.*, pp. 168-69), the plaintiff recalls that he was restricted to his unit for seven days as a result of the report.  (Complaint, p. 11.)

Facts Relating to Defendant Monahan

The plaintiff is suing Thomas Monahan solely on the basis that Monahan was the Joliet TDF's facility director.  (Exhibit B to Monahan's Motion for Summary Judgment, Deposition of Juan

McGee, at p. 93.) The plaintiff believes, "As director of the facility, he's supposed to know everything. (*Id.*, p. 89.) "[I]f you a director that mean you have–you have to have personal knowledge of everything that goes on." (*Id.*, p. 93.) Monahan did not participate in behavior management committee hearings; he simply signed off on incident reports. (*Id.*, pp. 108, 127.) Monahan never punished the plaintiff for reporting wrongful conduct on the part of a DHS employee. (*Id.*, p. 126.) Monahan never personally took any adverse action against the plaintiff. (*Id.*, p. 122.)

## III.  ANALYSIS

### A.  General Living Standards

The court has previously ruled that DHS officials were acting within their bounds in operating the Joliet TDF much like a prison; the court additionally upheld the preferential treatment of residents who refused to participate in the sex offender treatment program. *See* Memorandum Opinion and Order of September 14, 2007, at pp. 6-7. The Constitution required Defendants to house the plaintiff under "humane conditions" and to provide him with "adequate food, clothing, shelter, and medical care." *Sain v. Budz*, No. 05 C 6394, 2006 WL 539351, *2 (N.D. Mar. 3, 2006) (Conlon, J.), *citing Farmer v. Brennan*, 511 U.S. 825, 832 (1994).

Like a pretrial detainee, a sexually violent person may not be subjected to conditions that amount to "punishment" without due process. *See, e.g., Jones v. Blanas*, 393 F.3d 918, 932 (9th Cir. 2004). "Persons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." *Youngberg v. Romeo*, 457 U.S. 307, 321-22 (1982). "[D]ue process requires that the conditions and duration of confinement . . . bear some reasonable relation to the purpose for which persons are committed." *Seling v. Young*, 531 U.S. 250, 265 (2001); *West v. Schwebke*, 333 F.3d 745, 748 (7th Cir. 2003).

Detainees may nevertheless be subjected to conditions that advance goals such as preventing escape and assuring the safety of others, even though they may not technically be "punished." *Allison v. Snyder*, 332 F.3d 1076, 1079 (7th Cir. 2003), *citing Allen v. Illinois*, 478 U.S. at 373-74 (1986).

Does placement in a prison, subject to the institution's usual rules of conduct, signify punishment? The answer, given by *Bell v. Wolfish*, 441 U.S. 520 (1979), is no. *Wolfish* held that pretrial detainees, who like civil committees may be held for security reasons but not punished, may be assigned to prisons and covered by the usual institutional rules, which are designed to assure safety and security.

*Allison*, 332 F.3d at 1079.

## B. The Plaintiff's Conditions Claim Against Liberty HealthCare Corporation

No material facts are in dispute with respect to the plaintiff's allegations against Liberty Healthcare, and Liberty has established that it is entitled to judgment as a matter of law. Although the plaintiff sues Liberty in connection with the conditions of his confinement at the Joliet TDF, Liberty has demonstrated that its only role at the Joliet TDF was to provide sex offender treatment. Neither Liberty nor its employees operated or maintained the physical plant of the Joliet TDF. Furthermore, the plaintiff cannot attribute any alleged mistreatment or misconduct to any Liberty employee. No individuals employed by Liberty are named as defendants, and the plaintiff never complained to Liberty or its employees about his living conditions. Any problems associated with the plaintiff's conditions cannot be imputed to Liberty employees when an inspector and the U.S. Court of Appeals for this circuit specifically found that conditions at the Joliet TDF were not "objectively serious enough to establish a constitutional violation." *Sain v. Wood*, 512 F.3d 886, 894 (7th Cir. 2008).

Even if the conditions of the plaintiff's confinement did violate his constitutional rights, Liberty cannot be held vicariously liable under 42 U.S.C. § 1983. "It is well-established that there is no *respondeat superior* liability under § 1983." *Jackson v. Illinois Medi-Car, Inc.*, 300 F.3d 760, 766 (7th Cir. 2002), *citing Horwitz v. Bd. of Educ.*, 260 F.3d 602, 619 (7th Cir. 2001). A "private corporation is not vicariously liable under § 1983 for its employees' deprivations of others' civil rights." *Ibid., quoting Iskander v. Vill. of Forest Park*, 690 F.2d 126, 128 (7th Cir. 1982). In order to prevail against a corporate unit, the plaintiff must establish that he has suffered a constitutional deprivation proximately caused by an express policy or widespread practice attributable to the

corporate defendant. *Id.* In this case, even assuming (without finding) that the conditions of the plaintiff's confinement at the Joliet TDF violated his constitutional rights, Liberty cannot be held liable because the plaintiff has failed to show that its employees were responsible for, or deliberately indifferent to, those conditions. Accordingly, summary judgment is granted in favor of Liberty Healthcare Corporation.

**C. The Plaintiff's Bad Food Claim Against Aramark Correctional Services**

Although the plaintiff contends that the food Aramark served at the Joliet TDF was non-nutritious, non-diabetic, and sometimes even putrid, the record does not contain sufficient evidence for the matter to go before a jury. In denying Aramark's motion to dismiss the complaint for failure to state a claim, the court specifically noted, "In order to survive a motion for summary judgment, Plaintiff will have to prove his claims, of course." *See* Memorandum Opinion and Order entered September 14, 2007, at page 14. While the plaintiff's allegations were sufficient to withstand a motion to dismiss, he has not met his burden at the summary judgment stage of these proceedings.

As noted above, the Constitution required Defendants to house Plaintiff under "humane conditions" and to provide him with adequate food, among other staples. *Sain v. Budz*, No. 05 C 6394, 2006 WL 539351, *2 (N.D. Mar. 3, 2006) (Conlon, J.), *citing Farmer v. Brennan*, 511 U.S. 825, 832 (1994). There is no question that inmates have a constitutional right to an adequate diet. *See, e.g., Antonelli v. Sheahan*, 81 F.3d 1422, 1432 (7th Cir. 1996). "The state must provide an inmate with a 'healthy, habitable environment.' This includes providing nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it." *French v. Owens*, 777 F.2d 1250, 1255 (7th Cir. 1985) (citations omitted).

In the case at bar, the plaintiff's claims that his diet did not comport with diabetic guidelines or that it was otherwise nutritionally inadequate is wholly without foundation. Presumably, a dietician planned institutional meals to ensure that inmates' basic dietary needs were met. The plaintiff has cited no authority whatsoever to support his contention that the food was unhealthy, nor

any medical or professional report calling into question the quality of the meals provided at the Joliet TDF. To the contrary, except for one, ten-day stomach ailment–the cause of which is unknown–the plaintiff admittedly never suffered any harm from the food during the ten months he spent at the Joliet TDF. The court has only the plaintiff's say-so that he was not served diabetic-appropriate meals.

There is no medical evidence that the plaintiff's single episode of stomach problems was related to food consumption. If the food were as bad as the plaintiff claims, surely he (and other detainees) would have become ill from the food time and again. In the absence of any detriment to the plaintiff's health or well-being, any drastic weight loss, or some other indicator that the food did not meet his basic needs, no reasonable trier of fact could conclude that the plaintiff did not receive a balanced diet, or that dietary deficiencies posed a serious risk to him.

Although the food may have been unpalatable or unappetizing, the Constitution provides only that inmates receive adequate nutrition; food that is not aesthetically pleasing or tasty does not violate an inmate's civil rights. *LeMaire v. Maass*, 2 F.3d 851, 861 (9th Cir. 1993), *citing Cunningham v. Jones*, 567 F.2d 653, 659-60 (6th Cir. 1977). Similarly, the fact that food was served cold does not implicate the Constitution. *See, e.g. Brown-el v. Delo*, 969 F.2d 644, 648 (8th Cir. 1992) (prisoner's claim that constitutional rights were violated when he was served cold food was frivolous); *see also Madyun v. Thompson*, 657 F.2d 868, 874-75 (7th Cir. 1981). "The Constitution does not require prison officials to provide the equivalent of hotel accommodations." *Lunsford v. Bennett*, 17 F.3d 1574, 1579 (7th Cir. 1994).

It should additionally be noted that the plaintiff never put Aramark on notice that there were perceived problems with spoiled or non-nutritious food. The plaintiff concedes that he never wrote to Aramark or filed a grievance about the quality of the food. We know that the plaintiff was familiar with the grievance process because he filed a grievance concerning a missed meal.[4] In short, there

---

[4]

The occasional missed meal does not rise to the level of a constitutional violation. *See, e.g.,Curiel*
(continued...)

is a dearth of evidence showing either that the food served at the Joliet TDF posed a substantial risk of serious harm, or that Aramark acted with deliberate indifference to a known risk. No outcome-dispositive facts are in dispute, and Aramark has established that it is entitled to judgment as a matter of law.

**D. Plaintiff's Claims Against the "Health Care Defendants"**

<u>1. The Plaintiff's Medical Care</u>

The record does not support an inference that defendants Carol Vance, Jovita Anyanwu, Alice Coleman, or Addus Health Care, Inc., acted with deliberate indifference to the plaintiff's serious medical needs. Notwithstanding any minor problems, the plaintiff received regular care for his chronic health conditions, as well as treatment for his one, arguably serious outbreak of stomach illness. Even if the health care staff now and again failed to observe some basic precautionary measures, there is no evidence that the plaintiff suffered any injury as a result of purportedly unsanitary practices. The plaintiff's subjective belief that poor practices may have adversely affected his health is wholly unsupported by the record.

Prison officials may not act with deliberate indifference to an inmate's serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 105 (1976). Detainees awaiting trial are similarly afforded *Estelle*-like protection against medical mistreatment under the Due Process Clause. *Holmes v. Sheahan*, 930 F.2d 1196, 1199 (7th Cir. 1991). "To cast this notion in the language of tort, the [State or] County has an affirmative duty to provide persons in its custody with a medical care system that meets minimal standards of adequacy." *Holmes*, 930 F.2d at 1199 (citations omitted). The subjective element of deliberate indifference encompasses conduct such as the refusal to treat a prisoner's chronic pain, *Jones v. Simek*, 193 F.3d 485, 490 (7th Cir. 1999), the refusal to provide pain

_____

[4](...continued)
*v. Stigler*, No. 06 C 5880, 2008 WL 904894, *5 (N.D. Ill. Mar. 31, 2008) (Zagel, J.), *citing Knox v. Wainscott*, No. 03 C 1429, 2003 WL 21148973, *8 (N.D. Ill. May, 14, 2003) (Manning, J.) (citations omitted); *Cunningham v. Eyman*, No. 95 C 2900, 2000 WL 748098, *6 (N.D. Ill. Jun.9, 2000) (Moran, J.).

14

medication prescribed by doctor, *Ralston v. McGovern*, 167 F.3d 1160, 1162 (7th Cir. 1999), or erroneous treatment based on a substantial departure from accepted medical judgment, practice, or standards. *Sherrod*, 223 F.3d at 611; *Vance v. Peters*, 97 F.3d 987, 992 (7th Cir. 1996).

In denying the defendants' motion to dismiss the complaint for failure to state a claim, the court nevertheless noted that the plaintiff's claims were borderline and admonished him, "Again, in order to defeat a motion for summary judgment, Plaintiff will have to substantiate his claims, proving by a preponderance of the evidence that he was harmed by shoddy medical practices." (Memorandum Opinion and Order dated September 14, 2007, at p. 12-13.) The plaintiff has provided no such proof.

The plaintiff cannot show that inadequate treatment exacerbated his diabetes or otherwise harmed him. It is undisputed that the plaintiff received insulin shots twice a day and oral medications once a day. There is no suggestion that the plaintiff suffered a diabetic attack or a complication relating to any other chronic health condition while housed at the Joliet TDF.

Nor is there any competent evidence that the plaintiff's sole medical issue, a stomach ailment shortly after his arrival at the facility, was the result of substandard medical practices. During his deposition, and throughout his response to the health care defendants' statement of facts, the plaintiff asserts that he "speculates" or "suspects" that the lack of gloves led to his illness and that "there is always the possibility" of such a cause and effect. However, an opponent of summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). "There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Lorillard Tobacco Co., Inc. v. A & E Oil, Inc.*, 503 F.3d 588, 594 -595 (7th Cir. 2007), *quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986) (internal citations omitted). The plaintiff's theory that he became sick due to the lack of prophylactic gloves, without some foundation upon which to base that hypothesis, is too meager a possibility to survive summary judgment.

The care the plaintiff received when he became ill in November 2005 further weakens any deduction of deliberate indifference. There is no dispute that the plaintiff was seen by a doctor each time he filled out a health care request form, and he was given medication to combat both his symptoms and the associated pain.

The plaintiff was not constitutionally entitled to see syringes unwrapped, drawn, or disposed of in his presence; nor did he have a protected interest in having health care providers don gloves before handling his medications. Although universal safety measures are strongly encouraged and might have given the plaintiff peace of mind, his subjective–and apparently unrealized–fears of contamination are not actionable under 42 U.S.C. § 1983.

Even assuming *arguendo* that the quality of the plaintiff's care was subpar, his inability to cite any harm defeats his claim. The plaintiff cannot recover damages for something that might have happened but did not. Even in constitutional torts, there is no tort without injury. *Janmark, Inc. v. Reidy*, 132 F.3d 1200, 1202 (7th Cir. 1997); *Niehus v. Liberio*, 973 F.2d 526, 532 (7th Cir. 1992) (collecting cases). " 'No harm, no foul' is a maxim of the law of torts (in legal rather than sports lingo: there is no tort without injury). This maxim is equally apt in administering the apparatus for seeking compensation after a tort." *Kanar v. U.S.,* 118 F.3d 527, 531 (7th Cir. 1997). "[F]ailing to provide a maximally safe environment, one completely free from . . . safety hazards is not [a form of cruel and unusual punishment]." *Carroll v. DeTella*, 255 F.3d 470, 472-73 (7th Cir. 2000). In the absence of any alleged injury whatsoever, shortcomings on the part of the health care staff did not violate the plaintiff's constitutional rights.

In short, while the court in no way condones some of the sloppy practices described by the plaintiff (handling meds after picking one's nose, offering pills that had been dropped on the floor, etc.), the plaintiff cannot obtain relief under 42 U.S.C. § 1983 because he cannot prove any actual harm. The plaintiff was entitled to constitutionally adequate care, *Johnson v. Doughty*, 433 F.3d 101, 1013 (7th Cir. 2006), not "the best care possible." *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1999.) The individual defendant health care providers did not provide such substandard medical

16

attention as to violate the Fourteenth Amendment. Furthermore, because the plaintiff has no claim against the doctor and nurse named as defendants, he cannot prevail against either health care unit administrator Carol Vance or Addus Health Care, Inc., on a the basis of *respondeat superior*.

## 2. The Plaintiff's Retaliation Claim

The plaintiff's "retaliation" claim against defendant Coleman is equally unfounded. The plaintiff claims that on an unspecified date, Coleman wrote him a disciplinary report for objecting when she dropped a cotton ball on the floor and then attempted to use it on the plaintiff. It is well settled that prison officials violate the Constitution when they retaliate against a prisoner for filing grievances or initiating lawsuits. *Bounds v. Smith*, 430 U.S. 817, 821 (1977); *Walker v. Thompson*, 288 F.3d 1005, 1009 (7th Cir. 2002). However, in the case at bar, the plaintiff has not set forth a chronology of events from which retaliatory animus can be inferred.

The court questions whether a punishment of seven days' unit restriction implicates the Constitution. In *Sandin v. Connor*, 515 U.S. 472 (1995), the Supreme Court held that state-created liberty interests are "generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." 515 U.S. at 484. In *Thielman v. Leean*, 282 F.3d 478 (7th Cir. 2002), the U.S. Court of Appeals for the Seventh Circuit applied *Sandin* to civilly detained individuals. The plaintiff's punishment strikes the court as *de minimis*.

In any case, the plaintiff has failed to demonstrate that a triable issue exists as to either his having engaged in protected activity, or that the disciplinary report was retaliatory in nature. First, there appears to be no record of any disciplinary report ever written by Coleman. (*See* Plaintiff's Depo., pp. 168-69.) Second, the plaintiff does not indicate that he had ever filed a grievance or lawsuit against Coleman prior to the alleged disciplinary action. The plaintiff has not articulated facts tending to show retaliation.

17

Third, the plaintiff's own deposition testimony belies his contention that the conduct report was "false." The plaintiff acknowledges that he became upset with Coleman on the date in question and raised his voice to her, even though he himself does not characterize his demeanor as aggressive. (Plaintiff's Depo., pp. 166-67.) It is understandable that a nurse would have felt threatened by an angry felon; mouthing off is not a protected activity. The defendant has demonstrated that the plaintiff was punished for violating rules, not for engaging in protected conduct. The plaintiff's own testimony dooms his assertion that the disciplinary report was fabricated, whether or not it was entirely justified. The plaintiff has not made an arguable showing that protected activity was a substantial or motivating factor in his being disciplined.

In sum, the health care provider defendants are entitled to judgment as a matter of law.

**E. Plaintiff's Claims Against Thomas Monahan**

The plaintiff admits that he has named Monahan as a defendant only because Monahan was the Joliet TDF's facility director, and not because Monahan personally violated the plaintiff's constitutional rights. As discussed *supra*, liability under 42 U.S.C. § 1983 requires a defendant's direct, personal involvement. *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995). Section 1983 creates a cause of action based on personal liability and predicated upon fault; thus, "to be liable under § 1983, an individual defendant must have caused or participated in a constitutional deprivation." *Pepper v. Village of Oak Park*, 430 F.3d 809, 810 (7th Cir. 2005) (citations omitted). The doctrine of *respondeat superior* (blanket supervisory liability) does not apply to actions filed under 42 U.S.C. § 1983. *See Sanville v. McCaughtry,* 266 F.3d 724, 740 (7th Cir. 2001). To be held liable under 42 U.S.C. § 1983, supervisors "must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see. They must in other words act either knowingly or with deliberate, reckless indifference." *Id.*

The court denied Monahan's motion to dismiss because *Antonelli v. Sheahan*, 81 F.3d 1422 (7th Cir. 1996), teaches that dismissal of a *pro se* complaint on grounds of lack of active personal involvement is inappropriate where the official's position justifies an inference that the official had

some direct involvement in the alleged violation. In *Antonelli*, the Court of Appeals found that an inference of involvement was justified to sustain claims asserted against certain senior officials where the claims alleged "potentially systemic," rather than "clearly localized," constitutional violations. *Id.* at 1428-29. However, the more fully developed record demonstrates no widespread problems. Because the plaintiff has no viable claim against the individual health care, psychiatric care, and food providers, defendant Monahan necessarily cannot be held liable as supervisor. *See e.g., Johnson v. Snyder*, 444 F.3d 579, 586 (7th Cir. 2006) (the fact that the plaintiff's medical needs were being addressed by the medical staff insulated the warden from liability).

The only broad issue raised in Count 2 that was not substantively addressed in the other defendants' summary judgment motions is the plaintiff's claim that he went without outdoor recreation for ninety days due to a series of disciplinary infractions. However, the plaintiff admits that: (a) he was given free range of his living unit even while on "closed management" status, and was not confined to his room; (b) he never attempted to do push-ups, sit-ups, or other exercise routines; and (c) his health did not deteriorate on account of being denied outdoor exercise.

There is no triable issue that the plaintiff's lack of outdoor exercise rose to the level of a constitutional deprivation. "Unless extreme and prolonged, lack of exercise is not equivalent to a medically threatening situation." *Harris v. Fleming*, 839 F.2d 1232, 1236 (7th Cir. 1988) (confinement in segregation unit for four weeks). There is a significant difference between a lack of outdoor recreation and an inability to exercise. The plaintiff was perfectly capable of improvising some kind of an exercise regimen in his room or living unit while on lockdown. Particularly where, as here, the plaintiff suffered no illness or injury, his protracted indoor confinement did not rise to the level of a constitutional violation.[5]

_____

[5]

The court has no occasion to consider whether the plaintiff's other complaints about his living conditions might state a cause of action against Monahan. The plaintiff specifically stated in his complaint (p. 8), as well as confirmed at his deposition (p. 90), that he was suing Monahan only in

(continued...)

**F. Plaintiff's Challenge to His Pretrial Detention**

Finally, it should be noted that the plaintiff devotes much ink in his briefs opposing summary judgment to the proposition that he should not be held in custody as a pretrial detainee. However, to the extent that the plaintiff challenges his pretrial confinement, he must file a petition for a writ of habeas corpus.

It is not proper for the plaintiff to raise new claims at the summary judgment stage of these proceedings. *See, e.g., Killis v. Medieval Knights, LLC*, No. 04 C 6297, 2007 WL 4302470, *3 (N.D. Ill. Dec. 4, 2007) (Zagel, J.): "This liberal pleading standard does not imply that a plaintiff may raise wholly new claims at the summary judgment stage." Regardless, the court cannot grant habeas relief in the context of a civil rights action. *Rogers v. Illinois Dept. of Corrections Special Evaluation Unit*, 160 F.Supp.2d 972, 977 -978 (N.D. Ill. 2001) (Kennelly, J.) (the court was not permitted to convert a civil rights complaint filed by civilly detained civil rights plaintiffs into a habeas action). If the petitioner wishes to contest his pretrial detention, he may petition the court for a writ of habeas corpus, which is available to persons challenging unconstitutional civil confinement as well as penal incarceration. *Cain v. Ryan*, 171 F.Supp.2d 813, 823 (N.D. Ill. 2001) (Gettleman, J.).

## <u>CONCLUSION</u>

For all of the foregoing reasons, the defendants' respective motions for summary judgment are granted. The plaintiff has failed to show that there is a genuine issue as to any material facts, and the defendants have demonstrated that they are entitled to judgment as a matter of law. Even viewing the record in the light most favorable to the plaintiff, no reasonable person could find that he was denied adequate food or medical care, that he was the victim of retaliation, or that the conditions of his confinement at the Joliet TDF violated his constitutional rights.

---

[5](...continued)
connection with Count II, relating to the plaintiff's medical care and alleged retaliation. In any event, Liberty's motion for summary judgment casts considerable doubt on the plaintiff's general conditions claims.

IT IS THEREFORE ORDERED that Liberty Healthcare's motion for summary judgment (#114) is granted.

IT IS FURTHER ORDERED that Aramark Correctional Services' motion for summary judgment (#105) is granted.

IT IS FURTHER ORDERED that the Addus Health Care defendants' motion for summary judgment [#85] is granted.

IT IS FURTHER ORDERED that Thomas Monahan's motion for summary judgment [#109] is granted.

IT IS FURTHER ORDERED that the plaintiff's motion opposing summary judgment [#125] is denied. The Clerk is directed to enter judgment in favor of all defendants pursuant to Fed. R. Civ. P. 56. The case is terminated.

**James B. Zagel**

**United States District Judge**

DATE: August 14, 2008